RECORD NO. 13-2185

IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

———————————

GEORGE DAVID ANGELICH,

*Plaintiff - Appellant,*

v.

MEDTRUST, LLC,

*Defendant - Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

———————————

**RESPONSE BRIEF OF APPELLEE**

———————————

Paul W. Mengel III
Brian F. Wilbourn
Nichole L. DeVries
PILIEROMAZZA PLLC
Suite 1100
888 17th Street, NW
Washington, DC 20006
(202) 857-1000 Telephone
pmengel@pilieromazza.com

*Counsel for Appellee*                    January 24, 2014

## <u>RULE 26.1 DISCLOSURE</u>

I, the undersigned, counsel of record for MedTrust, LLC, certify that to the best of my knowledge and belief, MedTrust, LLC has no parent companies and there are no publicly held corporations that own 10% or more of its stock.

Date:   January 24, 2012                    Respectfully Submitted,

By:   /s/ Paul W. Mengel III
Paul W. Mengel III
DC Bar Number:  457207
PilieroMazza PLLC
888 17th Street, NW, 11th Floor
Washington, DC   20006
PHONE:     (202) 857-1000
FAX: (202) 857-0200
EMAIL:      pmengel@pilieromazza.com

*ATTORNEY FOR DEFENDANT*
*MEDTRUST, LLC*

i

# **TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE ........................................................................i

TABLE OF AUTHORITIES ......................................................................iv

STATEMENT OF THE CASE ....................................................................1

STATEMENT OF ISSUES ........................................................................6

STANDARD OF REVIEW ........................................................................7

     A.   Order Granting Summary Judgment....................................................7

     B.   Order Denying Dr. Angelich's Request for Continuance ......................7

ARGUMENT ........................................................................................8

     A.   The Question of Whether MedTrust Performed a "Thorough" or "Proper" Investigation Under Title VII of the Civil Rights Act of 1964 or the Age Discrimination in Employment Act of 1967 is Not at Issue ...........................................................................8

     B.   The Trial Correctly Granted Summary Judgment on Dr. Angelich's Claim for Wrongful Discharge .........................................11

     C.   The Trial Court Correctly Granted Summary Judgment on  Dr. Angelich's Claim for Defamation .........................................15

     D.   The Trial Court Correctly Granted Summary Judgment on Dr. Angelich's Claim for Tortious Interference With Business Expectancy ...........................................................................21

     E.   The Trial Court Correctly Granted Summary Judgment on Dr. Angelich's Claim for Intentional Infliction of Emotional Distress .....26

     F.   The Trial Court Did Not Abuse Its Discretion in Denying Appellant's Motion for a Continuance ...............................................30

CONCLUSION ....................................................................................35

STATEMENT FOR ORAL ARGUMENT ........................................................35

ii

CERTIFICATE OF COMPLIANCE ........................................................................ 36

CERTIFICATE OF SERVICE ............................................................................. 37

# TABLE OF AUTHORITIES

## CASES

<u>Page</u>

*Allen Realty Corp. v. Holbert,*
    227 Va. 441 (1984) ........................................................21

*Askew v. Collins,*
    283 Va. 482 (2012) ........................................................20

*Bailey v. Scott-Gallaher, Inc.,*
    253 Va. 121 (1997) ........................................................12

*Bowman v. State Bank of Keysville,*
    229 Va. 534 (1985) ..........................................................9

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..........................................................7

*Chaves v. Johnson,*
    230 Va. 112 (1985) ........................................................21

*Commerce Funding Corp. v. Worldwide Sec. Services Corp.,*
    249 F.3d 204 (4th Cir. 2001) ......................................24

*Coppage v. Mann,*
    906 F. Supp. 1025 (E.D. Va. 1995) ............................28

*Duggin v. Adams,*
    234 Va. 221 (1987) ........................................21, 24, 25

*First Va. Banks, Inc. v. BP Exploration & Oil, Inc.,*
    206 F.3d 404 (4th Cir.2000) ........................................9

*Goddard v. Protective Life Corp.,*
    82 F. Supp. 2d 545 (E.D. Va. 2000) ............................27

*Greene v. Nat'l Head Start Ass'n, Inc.,*
    2010 WL 1779677 (E.D. Va. 2010) ............................18

*Karpel v. Inova Health System Services*,
    134 F.3d 1222 (4th Cir.1998) .......................................................... 9

*Larimore v. Blaylock,*
259 Va. 568 (Va. 2000) ..................................................................... 18

*Lawrence Chrysler Plymouth Corp. v. Brooks*,
    251 Va. 94 (1996) ............................................................................ 12

*Leverton v. Alliedsignal, Inc.*,
    991 F. Supp. 486 (E.D. Va. 1998) .................................................... 12

*Maximus, Inc. v. Lockheed Information System, Inc.*,
    254 Va. 408 (1997) .......................................................................... 24

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ......................................................................... 11

*Miller v. SEVAMP, Inc.*,
    234 Va. 462 (1987) .......................................................................... 12

*Morris v. Slappy*,
    103 S.Ct. 1610 (1983) ........................................................... 7, 8, 32, 33

*Muth v. United States*,
    1 F.3d 246 (4th Cir.1993) .................................................................. 9

*National City Bank of Ind. v. Turnbaugh*,
    463 F.3d 325 (4th Cir. 2006) ............................................................. 7

*Oakley v. The May Department Stores Co.*,
    17 F. Supp. 2d 533 (E.D. Va. 1998) ................................................. 12

*PBM Products, LLC v. Mead Johnson Nutrition Co.*,
    678 F. Supp. 2d 390 (E.D. Va. 2009) ............................................... 15

*Peterson v. Cooley*,
    142 F.3d 181 (4th Cir. 1998) ........................................................... 21

*Russo v. White*,
    241 Va. 23 (1991) ........................................................................... 29

*Shirvinski v. U.S. Coast Guard*,
    673 F.3d 308 (4th Cir. 2012) ........................................18, 19, 25, 26

*Suarez v. Loomis Armored US, LLC*,
    2010 WL. 51011853 (E.D. Va. Dec. 7, 2010)...............................18

*Sylvia Dev. Corp. v. Calvert Cnty., Md.*,
    48 F.3d 810 (4th Cir. 1995) ...........................................................7

*Tyree v. Harding*,
    11 Va. Cir. 446 (1977) ...................................................................18

*Union of Needletrades, Industrial & Textile Emps. AFL-CIO v. Jones*,
    268 Va. 512 (2004) ........................................................................18

*United States v. Cole*,
    631 F.3d 146 (4th Cir. 2011) .....................................................8, 32

*United States v. LaRouche*,
    896 F.2d 815 (4th Cir. 1990) .........................................................34

*United States v. Williams*,
    445 F.3d 724 (4th Cir. 2006) .....................................................8, 33

*Warner v. Buck Creek Nursery, Inc.*,
    149 F. Supp. 2d 246 (W.D. Va. 2001)...........................................13

*Womack v. Eldridge*,
    215 Va. 338 (1974) .........................................................................28

## STATUTES

29 U.S.C. § 621 et seq..............................................................................8, 9
42 U.S.C. § 2000 et seq................................................................................8
42 U.S.C. § 2000e .......................................................................................11
42 U.S.C. § 2000e-5(a) .................................................................................8
Va. Code § 8.01-247.1 .................................................................................20
Va. Code § 18.2-417 ....................................................................................13
Va. Code § 18.2-499 ....................................................................................13

## RULES

Fed. R. Civ. P. 56 .......................................................................................7

## OTHER AUTHORITIES

Age Discrimination in Employment Act of 1967("ADEA")............................6, 8, 9

Title VII of the Civil Rights Act of 1964 ("Title VII") ...................................8, 9, 10

## I.    STATEMENT OF THE CASE

This frivolous appeal involves a psychologist plaintiff, George David Angelich ("Dr. Angelich"), who sued his former staffing company employer, MedTrust, LLC ("MedTrust").  By way of background, on October 5, 2009, Dr. Angelich began working for MedTrust, providing adult psychological services for the Department of Defense ("DoD") at Ft. Belvoir under MedTrust's contract with DoD.  *See* J.A. Vol. I, p. 238, Par. 3.   Dr. Angelich understood that his employment was at-will and was not guaranteed for any specific period of time.  *See* J.A. Vol. I, p. 246, lines 1-6, 13-19.  Dr. Angelich initially split his time between the clinics at Ft. Belvoir and Ft. Myer, but eventually began working at the Ft. Myer clinic full-time.  *See* J.A. Vol. I, p. 239, Par.8.  DoD employees directly supervised Dr. Angelich's work at Ft. Belvoir and Ft. Myer.  *See* J.A. Vol. I, p. 239, Par.9; p. 252, lines 6-15

In 2011, allegations of sexual harassment were made against Dr. Angelich by a co-worker, Melissa Kagen.  *See* J.A. Vol. I, p. 239, Par.11; p. 326, Par. 7.  Ms. Kagen reported the alleged sexual harassment to her direct supervisor, Johanna Hunter, a DoD employee.  *Id.*  In August of 2011, Ms. Kagen came to the belief that Ms. Hunter was not sufficiently addressing her concerns about Dr. Angelich's harassing conduct, so she brought her concerns to the attention of Tammy Hester,

1

MedTrust's program manager. *See* J.A. Vol. I, p. 329, Par. 11; pp. 333-334; p. 326, Par. 7; pp. 321-322.

When MedTrust learned of Ms. Kagen's concerns with regard to sexual harassment by Dr. Angelich, it promptly commenced an investigation. *See* J.A. Vol. I, p. 330, Par. 12. As part of its investigation, MedTrust participated in a conference call with DoD representatives at Ft. Myer to ascertain what was being done to address the concerns in order to protect and provide a safe work environment for MedTrust staff. *See* J.A. Vol. I, p. 239, Par. 12. During the course of the conference call, the specifics of the underlying harassment allegations were not discussed, only the fact that allegation of harassment had been made against Dr. Angelich by Ms. Kagen and that MedTrust was investigating. *See* J.A. Vol. I, p. 330, Par. 14; p. 355, line 6- p. 356, line 4.

Dr. Angelich cannot and does not dispute either (i) that Ms. Kagen made an allegation of sexual harassment against him or (ii) that MedTrust investigated those allegations. Instead, although it has no legal relevance whatsoever with respect to the claims at issue in the underlying litigation, Dr. Angelich's appeal hinges on his contention that the investigation conducted by MedTrust was not sufficiently "thorough." Brief of Appellant, pp. 11, 38; J.A. Vol. II, p. 607, line 22 – p. 608, line 7.

2

In the spring or summer of 2011, at around the same time that Ms. Kagen made the complaint of sexual harassment to MedTrust, a DoD position became available for which Dr. Angelich applied and interviewed. *See* J.A. Vol. I, p. 239, Par. 10. Dr. Angelich was ultimately not offered the position. *See* J.A. Vol. I, p. 240, Par. 15. DoD personnel testified in deposition that MedTrust had no influence over DoD's decision whether or not to hire Dr. Angelich. *See* J.A. Vol. I, p. 360, lines 9-16. Rather, DoD personnel testified that they became aware of inappropriate text messages between Dr. Angelich and other DoD personnel that included what would be considered harassment of co-workers and inappropriate comments in a professional environment. *See* J.A. Vol. I, p. 346, line 11- p. 350, line 1; p. 295-297; p. 359, lines 12-18.

In particular, DoD personnel found inappropriate messages where Dr. Angelich was "saying she can sit on my face when you're talking about your direct supervisor. Saying if Johanna [Hunter] gets drunk, maybe get lucky with her and get a higher ranking job if that's what it takes when she is department chief." *See* J.A. Vol. I, p. 357, line 2-.p. 358, line 11. The text messages, in conjunction with prior concerns regarding Dr. Angelich's performance with patients and complaints of harassment, led DoD to the conclusion that Dr. Angelich was "not a good fit for this organization." *See* J.A. Vol. I, p. 347, lines 5-16.

3

Accordingly, based on the undisputed facts in the record, the entirety of Dr. Angelich's suit against MedTrust can be succinctly summarized as follows: MedTrust received a complaint from Ms. Kagen that Dr. Angelich had sexually harassed her. MedTrust commenced an investigation into these allegations. During the course of the investigation, MedTrust communicated to DoD personnel the *existence* of the investigation. Therefore, according to Dr. Angelich, MedTrust is liable for (i) wrongful termination, (ii) defamation, (iii) intentional infliction of emotional distress, and (iv) tortious interference with business expectancy. Not surprisingly, in the absence of any specific facts supported by affidavits, depositions, interrogatories or a scintilla of evidence that would have presented a genuine issue for trial as to any of these claims, the District Court granted summary judgment in favor of MedTrust as to all counts. *See* J.A. Vol. II, pp. 601-613. The District Court also denied Dr. Angelich's last-minute motion for a continuance in order to depose Johanna Hunter, a witness whom Dr. Angelich identified in the initial Complaint filed in this action, yet still had not been deposed by Dr. Angelich almost one year later, when the discovery period expired.

Dr. Angelich has now filed what can only be described as an utterly frivolous appeal. Indicative of the specious nature of Dr. Angelich's case was the fact that, when chided by the trial court at argument on summary judgment that

4

"you don't continue to maintain a breach of contract action when there's just no basis to continue," Dr. Angelich attempted to withdraw the claim. But as the Court pointed out, "[w]ell, that's fine that you're doing it today, but you should have done it sooner rather than putting the defense to the burden and expense of having to litigate it." *See,* J.A. Vol. II, p. 604, lines 1-20. Dr. Angelich's remaining claims suffered from the same deficiencies and were equally meritless. As established by the record before the Court, and as explained in detail below, the trial court correctly granted summary judgment on Dr. Angelich's claim for wrongful discharge because it is undisputed that Dr. Angelich was an at-will employee and Dr. Angelich cannot identify any viable public policy that was violated by the discharge.

The trial court correctly granted summary judgment on Dr. Angelich's claim for defamation because the only allegedly defamatory statement (i.e., MedTrust's communications of the fact that Dr. Angelich was being investigated for sexual harassment) was both true and privileged. Dr. Angelich's claim for tortious interference and intentional infliction of emotional distress fail for the same reasons—MedTrust's actions in engaging in communications regarding the *existence* of its investigation into sexually harassing conduct by Dr. Angelich were both true and privileged and, accordingly, cannot, as a matter of law, serve as the

"wrongful" or "outrageous" conduct required to support claims of tortious interference or intentional infliction of emotion distress respectively. In sum, there was no factual or legal basis to support any of Dr. Angelich's claims and the District Court correctly granted summary judgment as to each count. Likewise, the District Court did not abuse its discretion in denying Dr. Angelich's unjustified, last-minute and dilatory request for a continuance.

## II.    STATEMENT OF ISSUES

    A. Did the District Court err by failing to address whether MedTrust's investigation of Dr. Angelich was "proper" or "thorough" in relation to Title VII of the Civil Rights Act of 1964 or the Age Discrimination in Employment Act of 1967?

    B. Did the District Court correctly grant summary judgment on Dr. Angelich's claim for wrongful termination?

    C. Did the District Court correctly grant summary judgment on Dr. Angelich's claim for defamation?

    D. Did the District Court correctly grant summary judgment on Dr. Angelich's claim for tortious interference?

    E. Did the District Court correctly grant summary judgment on Dr. Angelich's claim for Negligent Infliction of Emotional Distress?

    F. Did the District Court abuse its discretion by denying Dr. Angelich's motion for continuance?

## III.  STANDARD OF REVIEW

### A. Order Granting Summary Judgment

On appeal, a district court's grant of summary judgment is reviewed *de novo*, with the Court of Appeals applying the same standard as the district court.  *See Nat'l City Bank of Ind. v. Turnbaugh,* 463 F.3d 325, 329 (4th Cir. 2006).  Under Fed. R. Civ. P. 56, the movant bears the burden of showing the absence of any genuine issues of material fact.  However, "once a defendant makes a properly supported motion for summary judgment, the burden shifts to the plaintiff to set forth specific facts showing that there is a genuine issue for trial."  *Sylvia Dev. Corp. v. Calvert Cnty.*, Md., 48 F.3d 810, 817 (4th Cir. 1995).  Thus, a non-moving party, who bears the burden of proof at trial, may not rest upon mere belief or conjecture, or the allegations and denials contained in his pleadings.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Rather, the non-moving party must set forth specific facts with affidavits, depositions, interrogatories or other evidence to show a genuine issue for trial.  *Id.*

### B. Order Denying Dr. Angelich's Request for Continuance

The U.S. Supreme Court has long recognized the deference to be afforded to trial courts in the matter of continuances and it is clear that "[b]road discretion must be granted trial courts on matters of continuances."  *Morris v. Slappy,* 103 S.

Ct. 1610, 1611 (1983). The Court noted in *Morris* that this broad discretion is required because "[t]rial judges necessarily require a great deal of latitude in scheduling trials." *Id,* at 1610. The appellate court standard of review of a trial court's denial of a request for a continuance is for an abuse of the exercise of that broad discretion. *U.S. v. Cole*, 631 F.3d 146, 156 (4th Cir. 2011). Abuse of discretion, in the context of a denial of a motion for continuance, has been defined as "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Morris*, 103 S. Ct. at 1610. However, with regard to an appeal of a denial of a continuance motion, the inquiry does not end at a finding of abuse of discretion by the trial court. "[E]ven if such an abuse is found, the defendant must show that the error specifically prejudiced [his] case in order to prevail." *United States v. Williams,* 445 F.3d 724, 739 (4th Cir. 2006).

## IV.  ARGUMENT

### A. The Question of Whether MedTrust Performed a "Thorough" or "Proper" Investigation Under Title VII of the Civil Rights Act of 1964 or the Age Discrimination in Employment Act of 1967 is Not at Issue

As an initial matter, MedTrust notes that more than half of Dr. Angelich's brief is devoted to the discussion of numerous cases involving claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000 et seq., or the Age Discrimination in Employment Act of 1967("ADEA"), § 2 et seq., 29

8

U.S.C.A. § 621 et seq.  Dr. Angelich's reliance on these cases is puzzling at best, inasmuch as Dr. Angelich has not, either in the Complaint or in the prior proceedings, ever asserted the existence of a Title VII or ADEA claim.  *See* J.A. Vol. I, p. 11-25.

To the extent Dr. Angelich is now trying to inject a Title VII argument into his appeal, the law is well-established that matters should not be considered for the first time on appeal.  Arguments raised for the first time on appeal are waived, unless the appellant can show that the court's refusal to consider the issue would be plain error or would "result in a fundamental miscarriage of justice." *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998).  *See also First Va. Banks, Inc. v. BP Exploration & Oil, Inc.*, 206 F.3d 404, 407 n. 1 (4th Cir. 2000) (declining to consider issues for first time on appeal); *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) (holding that issues raised for first time on appeal generally will not be considered absent exceptional circumstances of plain error or fundamental miscarriage of justice).

By his own admission, Dr. Angelich's actions are based in common law tort, not on federal statutes.  *See* Brief of Appellant, pp. 9, 28.  As such, he must defend against MedTrust's Motion for Summary Judgment with evidence that creates an issue of fact as to the causes of action asserted in his Complaint and put before the

District Court, not red-herring issues raised for the first time on appeal.  Dr. Angelich himself points out that, unlike the cases he is citing in support of his arguments, the instant case is a tort action, <u>not</u> a discrimination case.  *Id*. at 28-29. Dr. Angelich, however, fails to articulate how his arguments with respect to the investigation of Ms. Kagen's sexual harassment complaint have any bearing on the legal viability of his tort claims.  Dr. Angelich fails to recognize that because there is no Title VII claim before the court, the extent of MedTrust's investigation (and whether it complied with Title VII) has no bearing whatsoever on any legally recognized cause of action he has asserted.  Indeed, not a single authority in the litany of Title VII and ADEA cases cited by Dr. Angelich addresses or stands for the proposition that a person accused of sexual harassment may bring a common law claim for wrongful termination, defamation, intentional infliction of emotional distress or tortious interference, based on an allegedly deficient investigation of the accusation.

Moreover, even if this Court were to entertain Dr. Angelich's assertion of some species of Title VII or ADEA claim, the cause of action would fail as a matter of law.  Not only has Dr. Angelich never filed such a claim with the Equal Employment Opportunity Commission, as required by the applicable statute, but the record is clear that Dr. Angelich would be unable to set forth a *primia facie*

case under either Title VII or the ADEA, because he has not established any question of fact that he is a member of a protected class that was discriminated against on the basis of the protections afforded by statute. 42 U.S.C. §§ 2000e-5(a) and 2000e-5(e); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798 (1973).

In short, the Title VII and ADEA cases cited by Dr. Angelich are of no relevance to this appeal. Instead, Dr. Angelich's muddled references to various Title VII and ADEA cases in support of his appeal serve only one purpose—to confuse the issues and distract the Court from focusing on the reality that Dr. Angelich cannot articulate *any* specific facts or legal basis upon which he may proceed on the claims actually at issue in the litigation, i.e., common law claims for wrongful discharge, defamation, intentional infliction of emotional distress and tortious interference.

## B. The Trial Correctly Granted Summary Judgment on Dr. Angelich's Claim for Wrongful Discharge

The record on appeal demonstrates MedTrust's entitlement to summary judgment on Dr. Angelich's claim for wrongful discharge because (1) it is undisputed that Dr. Angelich was an at-will employee and (2) and Dr. Angelich cannot establish that the purported discharge was against public policy.

Under Virginia law, the employment-at-will doctrine "is a firmly embedded precept of the common law," which provides that "when the intended duration of a

11

contract for the rendition of services cannot be determined by fair inference from the terms of the contract … then either party is ordinarily at liberty to terminate the contract at will…." *Leverton v. Alliedsignal, Inc.*, 991 F. Supp. 486, 489 (E.D. Va. 1998) (quoting *Bailey v. Scott-Gallaher, Inc.*, 253 Va. 121, 124). Accordingly, a claim for wrongful discharge is ordinarily not cognizable where the employment was at-will. The Virginia Supreme Court has recognized only one exception to this doctrine, that is, where at-will employment is concerned, "employees may recover damages from employers for discharges that are against Virginia's public policy." *Oakley v. The May Department Stores Co.*, 17 F. Supp. 2d 533, 535 (E.D. Va. 1998) (citing *Bowman v. State Bank of Keysville,* 229 Va. 534 (1985)).

Courts have explained that, in order for a claim for wrongful discharge to succeed under Virginia law, the plaintiff must be able to identify a "Virginia statute establishing a public policy violated by the defendant in terminating the plaintiff." *Leverton,* 991 F. Supp. at 490 (citing *Lawrence Chrysler Plymouth Corp. v. Brooks*, 251 Va. 94 (1996)) (emphasis added). Courts have further elaborated that the statute identified must be "designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general." *Oakley*, 17 F. Supp. 2d at 535 (citing *Miller v. SEVAMP, Inc*., 234 Va. 462, 468 (1987)). Accordingly, the public policy exception "does not apply to private

12

rights, but instead, to policies established by laws that are designed to protect the public." *Id*.

In opposing MedTrust's Motion for Summary Judgment, Dr. Angelich obliquely referred in his papers to a single statute, Va. Code § 18.2-499, which is a criminal statute that prohibits conspiracy to injure another in his trade, business, or profession. *See* J.A. Vol. II, pp. 363-376. On appeal, Dr. Angelich has now apparently abandoned his reliance on that statute and for the first time, asserts that his claim for wrongful discharge is based on the violation of another statute, Va. Code § 18.2-417. *See* Brief of Appellant, pp. 30-31. Va. Code § 18.2-417 is a criminal statute prohibiting libel and slander. Accordingly, it is apparently Dr. Angelich's position that he is entitled to proceed on a claim for wrongful discharge because he has "a statutorily-created right to be free from conspiracies … to defame his professional standing vis-à-vis future/prospective employers." *See* Brief of Appellant, p. 31.

Dr. Angelich's position in this regard is absolutely wrong as a matter of law. In *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 263 (W.D. Va. 2001), the Court explained:

> **The defendants contend that [plaintiff's] use of the criminal statutes at issue here is flawed because he uses them to show that the defendants engaged in illegal conduct, not to show that he engaged in protected activity for which he was fired**. The

13

> defendants' point is well taken. A review of the major cases in which the Virginia Supreme Court has addressed the public policy exception to the at-will employment rule reveals that the plaintiffs in those cases all sought redress because they were fired for engaging in what they believed to be protected activity …. it is apparent that [plaintiff's] complaint fails to state a claim for wrongful discharge in violation of Virginia public policy …. [Plaintiff] does not have a "statutorily-created right" which was violated by his termination. Furthermore, he has not alleged that he had "a statutorily-imposed duty" which he was terminated for refusing to violate.

(Emphasis added).

Here, similarly, Dr. Angelich unsuccessfully attempts to use criminal statutes to show that MedTrust engaged in illegal conduct, <u>not</u> to show that he engaged in protected activity for which he was fired.

Moreover, even if Dr. Angelich's claim was not fundamentally flawed and legally insufficient, which it is, the record reveals no factual basis whatsoever for a finding that MedTrust actually violated the criminal statutes at issue, nor is there any basis for finding that MedTrust discharged Dr. Angelich for refusing to engage in conduct that would have violated these statutes. Accordingly, Dr. Angelich's claim for wrongful discharge fails as a matter of law and the award of summary judgment on that claim should be affirmed.

**C. The Trial Court Correctly Granted Summary Judgment on Dr. Angelich's Claim for Defamation**

The record on appeal demonstrates that MedTrust is entitled to summary judgment on Dr. Angelich's claim for defamation because (1) the allegedly defamatory statements were true, (2) the allegedly defamatory statements were privileged, and (3) any claims arising out of the allegedly defamatory statements are barred by the applicable statute of limitations.

The only purportedly defamatory statements that Dr. Angelich has attributed to MedTrust, in either his opposition to the Motion for Summary Judgment or in this appeal, is MedTrust's alleged communication of the *fact* that Dr. Angelich was being investigated for sexual harassment. *See* J.A. Vol. II, p. 391; Brief of Appellant, p. 36. As the Court explained during the hearing on MedTrust's Motion for Summary Judgment, "the problem," with Dr. Angelich's claim for defamation is that "it's an absolute defense to defamation if the statement is true." J.A. Vol. II, p. 607, lines 14-16. *See also PBM Products, LLC v. Mead Johnson Nutrition Co.*, 678 F. Supp. 2d 390, 399 (E.D. Va. 2009) (holding that in order to be actionable for defamation, the communications at issue must be "actually and provably false.").

Here, incredibly, Dr. Angelich seeks to proceed with his claim for defamation, premised solely on MedTrust's communications regarding Dr.

Angelich being under investigation for sexual harassment, despite the undisputed fact, fully documented in the record, that any such statements were true.  It is undisputed that Dr. Angelich was indeed being investigated for sexual harassment. Specifically, allegations of sexual harassment were made against Dr. Angelich by a co-worker, Melissa Kagen, who reported the alleged sexual harassment to her direct supervisor Johanna Hunter, a government employee. *See* J.A., Vol. I, p. 239, Par. 11; p. 326, Par. 7. Among the actions that Ms. Kagen found harassing or sexually harassing were Dr. Angelich's repeatedly asking her out for dates; Dr. Angelich's repeatedly asking her out to lunch; Dr. Angelich's suggestion via text message that she watch internet pornography; Dr. Angelich's description of her behavior as castrating; and Dr. Angelich calling her mean and biting in front of her superior. *See* J.A. Vol. I, p. 275, lines 6-14; p. 261, lines 6-19*;* p. 262, lines 13-21; p. 318, line 7- p. 319, line 1; p. 326, Par. 6.

In August of 2011, when MedTrust learned of Ms. Kagen's concerns with regard to harassment by Dr. Angelich, it promptly commenced an investigation. *See* J.A. Vol. I, p. 329, Par. 11-14; p. 333-334; p. 326, Par. 9; p. 347, line 22- p. 348, line 10.  Dr. Angelich cannot and does not dispute that MedTrust investigated the sexual harassment allegations.  Instead, undaunted either by the pertinent facts or applicable law, Dr. Angelich maintains that he may nonetheless recover for

defamation, based on MedTrust's statements that Dr. Angelich was being investigated for sexual harassment, because, although it was true that there was a sexual harassment investigation, that investigation, in his opinion, wasn't "proper" or sufficiently "thorough." *See* J.A. Vol. II, p. 607, lines 22-25; Brief of Appellant, p. 38.

As the District Court properly recognized, for the purposes of Dr. Angelich's defamation claim:

> Whether there's a defect in the investigation or not **is irrelevant**. The point is it is true, it is a fact that he was under investigation….
>
> [W]hether the case would have been successful if there had been a harassment lawsuit [against Dr. Angelich] is another question. The issue solely before this Court is was it defamatory for there to be communication with the military folks that [Dr. Angelich] was under investigation or they were concerned because there had been a complaint by Ms. Kagen that she was being sexually harassed by [Dr. Angelich]. Clearly, there's no basis for defamation under that fact pattern. (Emphasis added).

J.A. Vol. II, p. 608, lines 3-5; p. 611, lines 3-12.

Since Dr. Angelich's claim for defamation is premised in its entirety on MedTrust's communications regarding *the fact* that it was investigating a complaint of sexual harassment against him, and since it is undisputedly true that MedTrust was, in fact, investigating a sexual harassment complaint against Dr.

Angelich, the Court properly granted summary judgment on Dr. Angelich's claim for defamation.

Moreover, in addition to the only allegedly defamatory statements being true, Dr. Angelich's claim for defamation also fails for two other reasons. First, as a matter of law, the allegedly defamatory statements were protected by privilege. The Virginia Supreme Court has held that an allegedly defamatory statement arising out of an employment relationship "may be afforded a qualified privilege if the statement is made between persons on a subject in which they have a common interest or duty." *See Suarez v. Loomis Armored US, LLC*, 2010 WL 5101185*3 (E.D. Va. Dec. 7, 2010) (citing *Union of Needletrades, Indus. & Textile Emps. AFL–CIO v. Jones,* 268 Va. 512, 519-520 (2004)). Generally, "employment matters are occasions of privilege," and such "communications are privileged so long as the speaker has an interest, or owes a duty, legal, moral, or social in the subject matter and the listener shares that interest." *Greene v. Nat'l Head Start Ass'n, Inc*., 2010 WL 1779677*8 (E.D. Va. 2010) (citing *Larimore v. Blaylock,* 259 Va. 568, 572 (Va. 2000); *Tyree v. Harding*, 11 Va. Cir. 446, 449 (1977)).

*Shirvinski v. U.S. Coast Guard*, 673 F.3d 308 (4th Cir. 2012) involved a situation similar to the one at issue here, where the defendants had discussed the plaintiff's conduct with the government customer, which ultimately led to the

18

termination of plaintiff's consulting contract.  There, the Court recognized the importance of protecting the types of communications at issue in this case, explaining that "[t]o penalize [defendant's] actions here would render unlawful unpleasant but necessary communications between government employees and contractors over problems their coworkers were causing in the workplace." *Id.* 321-322.  Similarly, it is undisputed in this case that Dr. Angelich had been accused of sexual harassment.  *See* J.A. Vol. I, p. 239, Par. 11.  There can be no question that both Dr. Angelich's employer, MedTrust, and the government client for whom Dr. Angelich was providing service, both had a duty and an interest in discussing the allegations of sexual harassment by Dr. Angelich.  To penalize those communications would, as in *Shirvinski*, render unlawful necessary communications between government employees and contractors over problems in the workplace. Therefore, given the respective interests of both MedTrust and the Government, communications between MedTrust and the Government concerning allegations of harassment by Dr. Angelich were plainly privileged under Virginia law, as the trial court correctly observed.  *See* J.A. Vol. II, p. 611, line 24.

Finally, even if the statements purportedly made by MedTrust were neither true nor privileged, which they are, Dr. Angelich's claim for defamation would be barred by the applicable statute of limitations.  Under Virginia law, "[e]very action

19

for injury resulting from libel, slander, insulting words or defamation shall be brought within one year after the cause of action accrues." Va. Code Ann. § 8.01-247.1. "Any cause of action that a plaintiff has for defamation accrues on the date that the defamatory acts occurred." *Askew v. Collins*, 283 Va. 482, 487 (2012).

Tellingly, in opposing MedTrust's Motion to Dismiss, Dr. Angelich never offered any explanation at all, much less any facts in support, as to why Dr. Angelich's claims are not barred by the applicable statute of limitations. *See* J.A. Vol. II, p. 363-393. The only facts set forth by Dr. Angelich that can be construed as MedTrust communicating with the DoD regarding allegations of sexual harassment are as follows: (i) Dr. Angelich contends that on August 16, 2011, MedTrust sent a letter to DoD regarding Ms. Kagen's complaint of sexual harassment (*See* J.A. Vol. II, p. 367, Par. 20); and (ii) Dr. Angelich contends that MedTrust engaged in a conference call with DoD personnel (*See* J.A. Vol. II, p. 369, Par. 30). Dr. Angelich's Complaint in this action was not filed until September 13, 2012. Therefore, any claim for defamation with respect to the August 16, 2011 communications were plainly barred the applicable one year statute of limitations. *See* Va. Code. Ann. § 8.01-247.1. Dr. Angelich makes no reference to when the conference call with DoD personnel took place, however, MedTrust has set forth undisputed facts in the record establishing that this

20

conference call took place before September 6, 2011. *See* J.A. Vol. I, p. 330 at Par. 16; p. 293. Accordingly, it is undisputed that the only allegedly defamatory communications identified by Dr. Angelich occurred more than one year prior to the filing of this suit and, therefore, MedTrust was entitled to summary judgment on Dr. Angelich's claim for defamation.

### D. The Trial Court Correctly Granted Summary Judgment on Dr. Angelich's Claim for Tortious Interference With Business Expectancy

Under Virginia law, in order to prove a claim for tortious interference with business expectancy, a plaintiff must prove the following elements: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *See Peterson v. Cooley*, 142 F.3d 181, 186 (4th Cir. 1998) (citing *Chaves v. Johnson,* 230 Va. 112, 120 (1985)). Additionally, "when alleging tortious interference with expectancy rather than with an actual contract, a plaintiff must show that the defendant interfered by employing improper methods." *Id*. (citing *Duggin v. Adams,* 234 Va. 221, 226 (1987); *Chaves,* 230 Va. 112, 121; *Allen Realty Corp. v. Holbert,* 227 Va. 441, 449 (1984)). The record on appeal

demonstrates that MedTrust is entitled to summary judgment on Dr. Angelich's claim for tortious interference with business expectancy because (1) MedTrust did not cause the termination of any business expectancy and (2) because MedTrust did not employ improper methods.

Dr. Angelich's claim for tortious interference is based on purported actions by MedTrust which allegedly resulted in Dr. Angelich being denied a job with the DoD. *See* Brief of Appellant, p. 39.   As a threshold matter, Dr. Angelich never received a formal job offer or any kind of communication from DoD containing any terms or aspects of a potential employment position. *See* J.A. Vol. I, p. 255, lines 10-12; p. 82, lines 6-10; p. 254, lines 13-16.  Accordingly, inasmuch as Dr. Angelich had no actual contract or realistic business expectancy, MedTrust obviously could not have interefered with such contract or expectancy.

Even if Dr. Angelich had a realistic expectancy of employment with DoD (which he did not), the undisputed facts demonstrate that MedTrust did not cause Dr. Angelich to lose any such opportunity.  DoD personnel testified that MedTrust never communicated in any way with the DoD about Dr. Angelich's job application and that MedTrust had no influence over DoD's decision whether or not to hire Dr. Angelich. *See* J.A. Vol. I, p. 360, lines 9-16; p. 256, lines 12-15. Rather, DoD personnel testified that they became aware of inappropriate text

22

messages between Dr. Angelich and other DoD personnel, that included what would be considered harassment of coworkers and inappropriate comments in a professional environment. *See* J.A. Vol. I, p. 346, line 11- p. 347, line 16; p. 295-297; p. 281, line 8- p. 282, line 9.

In particular, DoD personnel found inappropriate messages where Dr. Angelich was "saying she can sit on my face when you're talking about your direct supervisor. Saying if Johanna [Hunter] gets drunk, maybe get lucky with her and get a higher ranking job if that's what it takes when she is department chief." *See* J.A. Vol. I, p. 357, line 2- p. 358, line 4. The text messages, in conjunction with prior concerns regarding Dr. Angelich's performance and complaints of harassment, led DoD to the conclusion that Dr. Angelich was "not a good fit for this organization." *See* J.A. Vol. I, p. 347, lines 12-18.

In short, Dr. Angelich cannot establish that actions by MedTrust caused DoD not to hire him. To the contrary, it was DoD's independent decision, based on information obtained from sources other than MedTrust, to not offer employment to Dr. Angelich. Accordingly, MedTrust is entitled to summary judgment on Dr. Angelich's claim for tortious interference.

Further, even assuming for the sake of argument that actions by MedTrust caused DoD not to hire Dr. Angelich, Dr. Angelich's claim for tortious interference

23

still fails as a matter of law, because Dr. Angelich is unable to identify any

improper conduct on the part of MedTrust.  As the trial court explained:

> [MedTrust has] got an allegation that there has been sexual
> harassment going on.  As an employer, they've got to investigate that.
> If not, they are opening themselves up to all sorts of liability.
>
> The only way in which given the nature of this employment
> relationship they can do that, because this person [Dr. Angelich] is not
> – these people are not working in a MedTrust office, they're working
> at Fort Myer or Fort Belvoir, wherever they were at the time, they
> have to go to the people on the scene.  The people on the scene
> happen to be the Department of Defense People…
>
> All that's happened here is an employer trying to investigate the
> complaint of one of its employees that she had been sexually harassed.
> In order to conduct that investigation, they have to see what's going
> on in the workplace, which happens to be not their workplace but the
> Department of Defense.  That's how the communication occurs.  It's
> totally protected…

J.A. Vol. II, p. 606, line 25 – p. 607, line 10; p. 611 line 21 – p. 612 line 1.

The ruling of the trial court is entirely in accord with both applicable

Virginia law and the undisputed facts of this case.  Under Virginia law, where the

plaintiff alleges tortious interference with a prospective economic advantage, a

plaintiff must demonstrate that the defendant employed "improper methods."

*Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 214 (4th

Cir. 2001) (citing *Maximus, Inc. v. Lockheed Info. Sys., Inc.,* 254 Va. 408, 413

(1997)). In *Duggin v. Adams,* 234 Va. 221 (1987), the Virginia Supreme Court

24

identified methods of interference that are considered "improper." Among the most egregious examples of improper conduct are those "that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Id*. at 226. Other egregious forms of interference "include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of insider or confidential information, or breach of a fiduciary relationship." *Id.* Less egregious improper methods include violations of "an established standard of a trade or profession ..., unethical conduct ..., sharp dealing, overreaching, or unfair competition...." *Id.*

Here, Dr. Angelich simply cannot identify any improper methods on the part of MedTrust. As the trial court noted, Dr. Angelich can demonstrate only that a MedTrust employee reported that she had been sexually harassed by Dr. Angelich, and that because DoD managed the worksite where the alleged harassment occurred, MedTrust discussed with DoD personnel the fact that Dr. Angelich was under investigation with respect to the sexual harassment complaint. In *Shirvinski*, the Court upheld the grant of summary judgment to defendants based on claims similar to those at issue in this case. In *Shirvinski*, the plaintiff claimed that the defendants engaged in a series of communications that led to the plaintiff's

25

termination as a consultant to a subcontractor on a federal government contract. In

rejecting the plaintiff's claim for tortious interference, the Court explained:

> For us to expand liability for tortious interference … to encompass [defendant's] conduct would work inestimable damage to public-private partnerships. The effective execution of a government contract depends upon candor and teamwork between public and private employees. To penalize [defendant's] actions here would render unlawful unpleasant but necessary communications between government employees and contractors over problems their coworkers were causing in the workplace … We thus decline to expand the reach of these actions far beyond what Virginia's highest court has authorized. The district court was right to dismiss [plaintiff's] tortious interference claim.

*Id.* at 321-322 (citations omitted).

Similarly, Dr. Angelich can, at best, merely allege that MedTrust engaged in

communications with the DoD concerning the existence of allegations concerning

problems that Dr. Angelich was allegedly causing in the work place.  Such actions

cannot constitute improper methods such as would allow a claim for tortious

interference.   Because Dr. Angelich cannot identify any improper methods

employed by MedTrust, MedTrust is entitled to summary judgment on Dr.

Angelich's claim for tortious interference.

### E. The Trial Court Correctly Granted Summary Judgment on Dr. Angelich's Claim for Intentional Infliction of Emotional Distress

To prevail on a claim of intentional infliction of emotional distress under

Virginia law, a plaintiff must establish (1) intentional or reckless conduct by the

defendant, (2) of an outrageous and intolerable nature, (3) which caused (4) severe emotional distress to the plaintiff. *See Goddard v. Protective Life Corp.*, 82 F. Supp. 2d 545, 557 (E.D. Va. 2000) (citing *Womack v. Eldridge*, 215 Va. 338). The record on appeal demonstrates MedTrust's entitlement to summary judgment on Dr. Angelich's claim for defamation because Dr. Angelich cannot, as a matter of law, establish either (1) conduct of an outrageous and intolerable nature or (2) severe emotional distress. As the trial court observed, the cause of action is highly disfavored in Virginia. *See* J.A. Vol. II, p. 612, lines 2-3.

Dr. Angelich's claim for intentional infliction of emotional distress is premised entirely on allegations that MedTrust communicated with the Army regarding the fact that Dr. Angelich was being investigated for sexual harassment and terminated his employment. *See* Brief of Appellant, p. 42. These facts cannot, as a matter of law, rise to the level of "outrageous" and "intolerable" conduct that is necessary to sustain a claim for intentional infliction of emotional distress. Rather, in order to succeed on a claim for intentional infliction of emotional distress, a plaintiff must prove that the defendant's conduct "offends against the generally accepted standards of decency and morality." *Goddard v. Protective Life Corp.*, 82 F. Supp. 2d 545, 557 (E.D. Va. 2000). "It is for the court to determine in the first instance, whether the defendant's conduct may reasonably be regarded as

27

so extreme and outrageous as to permit recovery." *Id.* (*quoting Womack v. Eldridge,* 215 Va. 338, 342 (1974)). "A court must grant summary judgment in favor of the defendant[] if, when viewing a defendant's conduct in light of all the facts in the record, the court determines the conduct does not rise to such an outrageous or extreme level as to offend generally accepted standards of decency and morality." *Id.* (citing *Coppage v. Mann*, 906 F. Supp. 1025, 1049-50) (E.D. Va. 1995). Courts have held that liability may be found "**only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community**." *Gaiters v. Lynn*, 831 F. 2d 51, 52 (4th Cir. 1987) (emphasis added).

As the trial court correctly recognized, clearly, there is no evidence in the record that would support a characterization of MedTrust's conduct as "outrageous" or "extreme" in this case. To the contrary, and as explained in Section D, *infra*, MedTrust's conduct in communicating with the DoD is exactly what one would expect of any prudent employer that found itself placed in MedTrust's position.

Moreover, Dr. Angelich's claim for intentional infliction of emotional distress also fails because Dr. Angelich cannot prove severe emotional distress.

28

Under Virginia law, a claim for intentional infliction of emotional distress is cognizable "only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo v. White*, 241 Va. 23, 27 (1991). In *Russo*, the Court found that the plaintiff's emotional distress was not sufficiently severe where the plaintiff alleged nervousness, trouble sleeping, stress and an inability to concentrate, and that she had withdrawn from activities, and where there were no allegations that the plaintiff had any objective physical injury caused by stress, that she sought medical attention, that she had been confined at home or in a hospital, or that she had lost income. *Id*. Similarly, in *Earley*, the court found that plaintiff's emotional distress was not sufficiently severe where plaintiff alleged that she suffered from renewed anxiety, was forced to resume taking anti-anxiety medication, and lost approximately ten pounds in weight. *Earley*, 540 F. Supp. 2d at 690.

Here, the only "emotional distress" Dr. Angelich claims to have incurred was depression and frustration related to his inability to find a job. *See* J.A. Vol. I, p. 276, line 12 - p. 277, line 1. Dr. Angelich does not claim any physical harm as a result of his alleged emotional distress. *See* J.A. Vol. I, p. 278, lines 16-18; p. 279, lines 2-3, 13-15, 17-19. As in *Russo*, Dr. Angelich's only physical symptoms were fatigue, tiredness and oversleeping (and Dr. Angelich put forth no expert

witnesses to testify otherwise). *See* J.A. Vol. I, p. 280, lines 6-11. Moreover, Dr. Angelich's stress and depression did not affect his ability to do his job, nor did it prevent him from doing other normal functions of life—he could live his life and do his job. *See* J.A. Vol. I, p. 284, line 15,- p. 285 line 17; p. 298-299; p. 286, line 4 - p. 287, line 3.

In sum, as in the cases discussed above, Dr. Angelich has, as a matter of law, failed to articulate any basis for finding that he suffered from severe emotional distress. Accordingly, MedTrust is entitled to summary judgment on Dr. Angelich's claim for intentional infliction of emotional distress.

### F. The Trial Court Did Not Abuse Its Discretion in Denying Dr. Angelich's Motion for a Continuance

Discovery was permitted to commence in this action as of January 17, 2013, pursuant to the terms of the initial Scheduling Order of that date. (Trial Court document No. 15). On January 31, 2013, in its Order denying MedTrust's motion to stay discovery, pending disposition of its motion to dismiss, the Court emphasized to the Parties the importance that discovery "move expeditiously" and that it "proceed as scheduled." *See* J.A. Vol. I, p. 92. On February 27, 2013, the Parties submitted for the Court's consideration their Joint Discovery Plan Order (J.A. Vol. I, pp. 101-104), the dates set forth in which were subsequently approved and adopted by the Court in its Scheduling Order, entered on March 4, 2013. *See*

30

J.A. Vol. I, pp. 105-110. By virtue of the Parties' agreement, the Scheduling Order provided that "[a]ll discovery shall be concluded by June 12, 2013." *See* J.A. Vol. I, p. 103.

On June 12, 2013, the date by which discovery was to be concluded, Dr. Angelich filed a motion seeking leave of Court to depose Melissa Kagen after the discovery cutoff (the "June 12 Motion") . *See* J.A. Vol. I, p. 121. The June 12 Motion, however, makes no mention of any perceived need to take the deposition of Johanna Hunter. *Id.* Indeed, Dr. Angelich represented to the Court, in the Memorandum submitted in support of the June 12 Motion, that Ms. Kagen was "the only 3rd non-party [sic] witness" he was seeking leave to depose outside the discovery cutoff. *See* J.A. Vol. I, p. 125.

Dr. Angelich was interviewed for his position at MedTrust by Johanna Hunter in or about October, 2009. *See* J.A. Vol. I, p. 13. Ms. Hunter is also mentioned twice more in Dr. Angelich's Complaint. *See* J.A. Vol. I, pp. 14-15. In the Parties' Written Stipulation of Uncontested Facts, Ms. Hunter is identified as Dr. Angelich's supervisor and the person to whom Ms. Kagen reported her allegations of being sexually harassed by Dr. Angelich. *See* J.A. Vol. I, p. 116. Thus, to the extent Dr. Angelich believed Ms. Hunter's testimony to be important to his case, it is reasonable to assume that he would have held this belief, if not at

31

the time of the aforementioned events, or since his termination from MedTrust in September, 2011, then certainly at the time of the retention of counsel and the filing of the Complaint in September of 2012. Yet, notwithstanding the alleged "value of Ms. Hunter's testimony," Dr. Angelich undertook no steps to secure the same until June 19, 2013, a week after the discovery cutoff, when he sent a "Touhy request to first interview Ms. Hunter." *See* Brief of Appellant, p. 46; J.A. Vol. II, p. 476.

On July 26, 2013, MedTrust filed its Motion for Summary Judgment. *See* J.A. Vol. I, p. 206. On July 30, 2013, Dr. Angelich, *for the first time*, attempted to subpoena Johanna Hunter to attend a *de bene esse* deposition. *See* J.A. Vol. II, p. 484.

As noted by the U.S. Supreme Court, "[b]road discretion must be granted trial courts on matters of continuances." *Morris v. Slappy,* 103 S. Ct. 1610, 1611 (1983). As the Court observed in *Morris,* this broad discretion is required because "[t]rial judges necessarily require a great deal of latitude in scheduling trials." *Id,* at 1610. The appellate court standard of review of a trial court's denial of a request for a continuance is for an abuse of the exercise of that broad discretion. *United States v. Cole*, 631 F.3d 146, 156 (4th Cir. 2011). Abuse of discretion, in the context of a denial of a motion for continuance, has been defined as "an

32

unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Morris*, 103 S. Ct. at 1610. However, with regard to an appeal of a denial of a continuance motion, the inquiry does not end at a finding of abuse of discretion by the trial court. "[E]ven if such an abuse is found, the defendant must show that the error specifically prejudiced [his] case in order to prevail." *United States v. Williams,* 445 F.3d 724, 739 (4th Cir. 2006). Under the facts as set forth above, Dr. Angelich falls hopelessly short of meeting these standards, and his appeal of the reasonable denial of unjustifiable motion to continue the trial must be dismissed.

As noted above, whatever significance Dr. Angelich might have believed that the potential testimony of Ms. Hunter might have held was known to him for at least two years prior to the discovery cutoff in the court below. Under the Orders governing discovery, Dr. Angelich had four months to arrange for the deposition of Dr. Hunter, yet he took no steps to even begin to do so until *a week after* the deadline for completing discovery. Thus he cannot with a straight face argue that the trial court's denial of his unjustifiable and last-minute motion for a continuance was either unreasonable or an "arbitrary insistence upon expeditiousness."

33

Under these facts, Dr. Angelich has not offered, and cannot offer, a justification for the delay in seeking to depose Ms. Hunter. Thus it strains credulity, at best, to hear Dr. Angelich blame the trial court for his own indolence in failing to exert the slightest effort to depose Ms. Hunter prior to the discovery cutoff. It is noteworthy that Dr. Angelich filed his continuance motion on August 18, 2013. As such, a far more likely scenario is that, faced with a hearing on MedTrust's motion for summary judgment five days hence and trial three days after that, Dr. Angelich scrambled to find a way to delay the proceedings in a desperate and dilatory attempt to keep his case alive. As this Court has observed, "[t]he later that a motion for a continuance is made, the more likely it is made for dilatory tactics; hence, it is less likely that the district court arbitrarily denied the continuance." *United States v. LaRouche*, 896 F.2d 815, 824 (4th Cir. 1990).

For the foregoing reasons, it is abundantly clear that Dr. Angelich cannot meet his burden of establishing an abuse of discretion in the denial of the motion to continue the trial, thus, it is respectfully requested that this Court find that the trial court did not err in doing so.

## V.    CONCLUSION

For the reasons set forth above, the District Court did not err in (1) granting summary judgment as to all counts and (2) denying Dr. Angelich's motion for a continuance.  Accordingly, the decision of the District Court should be affirmed.

## VI.    STATEMENT REGARDING ORAL ARGUMENT

MedTrust hereby respectfully requests oral argument on the issues presented, to the extent this Honorable Court deems such to be appropriate under the circumstances.

Respectfully Submitted,

MEDTRUST, LLC

By Counsel

/s/ Paul W. Mengel III
Paul W. Mengel III
Brian F. Wilbourn
Nichole L. DeVries
PILIEROMAZZA PLLC
888 17th Street, NW, Suite 1100
Washington, DC 20006
Phone: (202) 857-1000
Fax: (202) 857-0200
pmengel@pilieromazza.com
bwilbourn@pilieromazza.com
ndevries@pilieromazza.com

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>
### <u>Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because: this brief contains 8,178 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.


Dated:  January 24, 2014          /s/ Paul W. Mengel III
                                  Paul W. Mengel III
                                  PILIEROMAZZA PLLC
                                  888 17th Street, NW, Suite 1100
                                  Washington, DC 20006
                                  Phone: (202) 857-1000
                                  Fax: (202) 857-0200
                                  pmengel@pilieromazza.com

36

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on January 24, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Carl L. Crews
C. Lowell Crews, Attorney at Law, PLLC
1655 Fort Myer Drive, Suite 700
Arlington, Virginia 22209
Phone: (703) 351-5263
Fax: (703) 997-8735
Email: legal@attorneycarlcrews.com

*Counsel for Appellant George David Angelich*

/s/ Paul W. Mengel III
Paul W. Mengel III
PILIEROMAZZA PLLC
888 17th Street, NW, Suite 1100
Washington, DC 20006
Phone: (202) 857-1000
Fax: (202) 857-0200
pmengel@pilieromazza.com